Charlie C. LESTER, Jr., Plaintiff,

v.

TWITCHELL, a DIVISION
OF LUDLOW, INC.,
Defendant.

Civ. A. No. 94–D–1640–S.

United States District Court,
M.D. Alabama,
Southern Division.

June 13, 1995.

Malcolm R. Newman, Dothan, AL, for plaintiff.

Jere C. Segrest, Tina Stamps, Dothan, AL, for defendant.

---

## MEMORANDUM OPINION

De MENT, District Judge.

Before the court is the defendant's motion for summary judgment filed April 24, 1995. The defendant contemporaneously filed a brief and tendered evidence in support thereof, to which the plaintiff responded in opposition on May 17, 1995. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendant's motion is due to be granted.

## JURISDICTION

Based upon 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction), the court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue.

## SUMMARY JUDGMENT STANDARD

■ On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ In further elaboration on the summary judgment standard, the court has said that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations

omitted). Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. *See Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

## FINDINGS OF FACT

The court views the evidence submitted in the light most favorable to plaintiff Charles C. Lester, Jr. (hereafter "plaintiff") and considers the following facts controlling in this case: The plaintiff commenced this action on December 27, 1994, alleging discriminatory discharge on the basis of race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

It is undisputed that on July 30, 1992, the plaintiff's sixteen years of employment with Twitchell (hereafter "defendant") ended in termination. The parties, however, hotly dispute the reasons underlying the plaintiff's discharge. As detailed below, the plaintiff asserts that the defendant fired him because of his purported involvement in an interracial relationship. The defendant, on the other hand, states that the plaintiff committed excessive violations of work rules.

The plaintiff, an African–American male, worked in various departments during his tenure with the defendant and was employed as a "samples clerk" on the date he was fired. His primary responsibility was shipping product samples to the defendant's potential and actual customers. Specifically, the plaintiff would receive from the defendant request forms containing a product sample number, customer mailing address, designated shipping carrier, billing instructions and deadline for mailing the product sample.

At all relevant times to this action, the supervisor for the samples department was Patricia Outlaw (hereafter "Outlaw"), who reported to Tony Ward (hereafter "Ward"), the manager of the samples department.[1] In an affidavit, Ward asserts that despite several documented warnings regarding the plain-

tiff's unsatisfactory job performance, the plaintiff continued to make costly mistakes, which ultimately resulted in his termination.

The alleged violations began on March 27, 1992, when Ward contends that he discussed with the plaintiff his failure to follow instructions on a request form dated February 27, 1992. Ward's Aff. at 2. Ward states that despite this verbal "counsell[ing]," the plaintiff mailed the samples one-month late and failed to notify the customer of the untimely delivery. *Id.* at 2–3. The plaintiff, on the other hand, contends that this conversation never occurred and that Ward's note memorializing this conversation is false. Pl.'s Aff. at 2.

Again on May 21, 1992, Ward states that he verbally warned the plaintiff of mistakes related to untimely shipping of samples and cautioned the plaintiff that subsequent mistakes would result in a written warning. Ward's Aff. at 3. Shortly thereafter, Ward contends that he asked the plaintiff to mail to a customer by May 29, 1992 certain samples via MSAS Cargo. *Id.* Ward asserts that not only were the instructions written on the request form, but he also verbally instructed the plaintiff. *Id.* at 3–4. According to Ward, the plaintiff mailed the samples four days late and selected the wrong shipping carrier. *Id.* at 4. The plaintiff denies that Ward "verbally reprimanded" him on this occasion. Pl.'s Aff. at 2.

As a direct result of the plaintiff's alleged failure to follow instructions on this particular occasion, Ward filled out a violation report dated June 2, 1992. Ward's Aff. at 4. Ward simultaneously placed the plaintiff on thirty-days probation and notified him that the any offense within the next twelve months would result in termination. *Id.* While the plaintiff admits that he was "written up," he states that Ward never supplied written instructions or told him that the customer had requested an unconventional shipping carrier. Pl.'s Aff. at 2.

According to Ward, the straw that broke the camel's back occurred on July 22, 1992, when the plaintiff failed to include zip codes on two packages, thus, delaying by one day

---

1. Both Outlaw and Ward are caucasian. *See* Pl.'s Dep. at 106.

the mailing of certain product samples to a customer. Ward's Aff. at 4. This one-day delay purportedly caused the defendant to lose an "important account." *Id.* at 5. The plaintiff asserts that Ward's version is a "complete lie" and that the untimely delivery in fact resulted from Ward's "failure to return the packages to the dock after it [had] stopped raining." Pl.'s Aff. at 2. Hence, the shipping carrier did not pick up the package.

Based upon the latter alleged mistake, as well as the plaintiff's purported "failure to follow instructions," "forgetfulness" and "poor job performance," Ward recommended on July 30, 1992 the plaintiff's immediate termination, approved the same day by the personnel director and plant manager. Ward's Aff. at 5. Believing that his discharge was racially motivated, the plaintiff filed on December 15, 1992 a charge of discrimination with the Equal Employment Opportunity Commission (hereafter "EEOC"). The EEOC issued to him a right-to-sue letter on September 28, 1994, after which the plaintiff initiated this lawsuit.

██ The plaintiff, on the other hand, asserts that the true motive for his termination relates to the defendant's belief that he was having an interracial relationship with a caucasian sales representative (hereafter "Lisa Jones"), who worked for an independent shipping carrier.[2] Pl.'s Dep. at 28. The plaintiff asserts that the defendant premises this assumption on the fact that the plaintiff had lunch with Lisa Jones once during the "second week of March [1992]." *Id.* at 31. According to the plaintiff, Ward called the plaintiff into his office immediately after the plaintiff had returned from lunch and said that "he was very upset that she asked [the plaintiff] instead of him" and then told the plaintiff that "[i]f she asks you again[,] you can't go." Pl.'s Answers to Def.'s Interrogs. at ¶ 12; *see also* Pl.'s Dep. at 31–32. On another occasion, the plaintiff asserts that Outlaw teased the plaintiff in the presence of

Ward by saying, "'Lisa Jones like[s] Charlie.'" *Id.* at 43.

On a different day, the plaintiff asserts that Chris Mathis (hereafter "Mathis"), also a supervisor, and Outlaw initiated a discussion with the plaintiff concerning their disapproval of "mixed races." *Id.* at 43–44; *see also* Pl.'s Aff. at 2. The plaintiff further contends that when Lisa Jones called him at work, no one would give him the message, *id.* at 67,[3] and when she stopped by to see him, Outlaw would alert Ward that she was there. *Id.*

In further support of his discriminatory discharge claim, the plaintiff asserts that if he completed his responsibilities and did not actively seek additional work, then Outlaw "accused" him of "just standing around" and would assign him menial tasks. *Id.* at 76–77; Pl.'s Answers to Def.'s Interrogs. at ¶ 14. The plaintiff contends, however, that Charles Harden, a caucasian male, was allowed to linger when he completed his tasks. Pl.'s Dep. at 76; Pl.'s Answers to Def.'s Interrogs. at ¶ 14.

## DISCUSSION

### I. Title VII: Disparate Treatment

#### A. Administrative Remedies

The court finds that the plaintiff has fulfilled the two jurisdictional prerequisites for instituting a Title VII lawsuit based upon discriminatory discharge. The plaintiff timely filed a charge of racial discrimination with the EEOC. Furthermore, after receiving a right-to-sue letter from the EEOC, the plaintiff seasonably instituted this action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973).

#### B. Analysis

██ In an action alleging disparate treatment under Title VII, a plaintiff must prove an intentional discriminatory motive by

---

**2.** At this point, the court notes that "Title VII prohibits racially discriminatory employment practices," which includes "discrimination based upon an interracial marriage or association." *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 891 & 892 (11th Cir.1986).

**3.** *See also* Pl.'s Answers to Def.'s Interrogs. at ¶ 15.

presenting either direct or circumstantial evidence of racial animus. *St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993); *see e.g., Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 771–72 (11th Cir.1982). Absent direct evidence, as is the case here, a plaintiff can establish intentional discrimination under the burden-shifting analysis set forth in *McDonnell Douglas*[4], *supra,* and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the *McDonnell Douglas* and *Burdine* framework,[5] the plaintiff must first raise an inference of discrimination by establishing a prima facie case. *Batey v. Stone,* 24 F.3d 1330, 1333 (11th Cir.1994) (citation omitted). If the plaintiff successfully carries his or her initial burden, then the defendant must "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Once the defendant satisfies its burden of production, "the *McDonnell Douglas* framework, with its presumptions and burdens,

drops out of the case, and the trier of fact proceeds to decide the ultimate issue in the case: whether plaintiff has proven that the employer intentionally discriminated against him because of his race." *Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1061 (11th Cir.1994) (*citing St. Mary's,* — U.S. at —, 113 S.Ct. at 2749).

■ Accordingly, the plaintiff must establish a prima facie case of discriminatory discharge by showing that (1) he belongs to a protected class; (2) that he was qualified for the position held; (3) that he was terminated; and (4) that the defendant awarded the position to someone outside the protected class.[6] *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994); *Green v. School Bd. of Hillsborough County,* 25 F.3d 974, 978 (11th Cir.1994). The Court of Appeals for the Eleventh Circuit recently has emphasized that a plaintiff cannot make out a prima facie case if he or she does not show that the position was in fact "awarded to a person of a non-protected class." *Id.*

**4.** While *McDonnell Douglas* involved an employer's hiring practices, "variants of its four factors apply in the context of wrongful discharge cases." *Lincoln v. Board of Regents,* 697 F.2d 928, 937 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983) (citations omitted).

**5.** The Supreme Court of the United States adopted this analysis to implement "[t]he language of Title VII," which "makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. at 1823.

**6.** The defendant asserts that in discriminatory discharge cases involving disparate discipline for employee violations of work rules, the framework articulated in *Jones v. Gerwens,* 874 F.2d 1534 (11th Cir.1989) is one method by which the plaintiff may establish a prima facie case. In that case, the Eleventh Circuit held that

in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him

were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540 (citation omitted).

At first glance, it appears that the defendant is correct. A closer examination of *Jones* and its progeny, however, reveals that one pivotal fact renders the analysis in *Jones* inapplicable to the instant case. In *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603 (11th Cir.1994), the plaintiff, who worked as a special agent in Southern Railway's internal police department, was fired for disclosing facts about a pending drug investigation in violation of a company confidentiality policy. The plaintiff, a black female, then filed a Title VII action contending discriminatory discharge on the basis of race.

In applying the burden-shifting analysis in *McDonnell Douglas,* the court held that the plaintiff had established a prima facie case of race discrimination "by setting forth evidence that she is black, that she was qualified for her job, that she was terminated and that she was replaced by a white person." *Id.* at 605. The court then rejected Southern Railway's reliance on the prima facie standard in *Jones:* "The holding in *Jones* ... applies only to Title VII cases in which a plaintiff has not been terminated and therefore cannot show that he or she was replaced by a person outside of the protected class." *Id.* at 605 n. 4. Here, as in *Cooper–Houston,* the fact that the plaintiff was fired is not in dispute.

In *Green,* the plaintiff was employed as a substitute food service worker and sought a permanent full-time position. Her employer, however, denied her the position and instead hired another substitute worker. Thereafter, the plaintiff filed an employment discrimination action under Title VII asserting national origin discrimination because she is of East Indian descent. Because the evidence at trial did not reveal the successful applicant's national origin, the Eleventh Circuit held that the trial court erred in finding that the plaintiff had established a prima facie case of discrimination.

■ The court thoroughly has combed the instant record and cannot find any evidence indicating or even implying that the defendant filled the position with a person not in the plaintiff's protected group. Accordingly, the court finds that the plaintiff has failed to raise a genuine issue of material fact as to an essential element of his case, thus warranting the granting of the defendant's motion for summary judgment as to the plaintiff's Title VII claim.[7]

## II. 42 U.S.C. § 1981

■ The plaintiff also seeks redress under 42 U.S.C. § 1981 for his claim alleging discriminatory discharge.[8] Because the same substantive analysis applies to § 1981 as under Title VII, the plaintiff's discriminatory discharge claim also must fail under § 1981.[9] *See Turnes v. AmSouth, NA.,* 36 F.3d 1057, 1060 (11th Cir.1994) (holding that "the *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in § 1981 cases involving discriminatory treatment in employment situations").

■ Moreover, an additional reason exists for granting summary judgment as to the plaintiff's § 1981 claim. The defendant urges, and the court agrees, that recourse under § 1981 is barred by the statute of limitations. The statute of limitations for

---

7. In so finding, the court need not continue its analysis under *McDonnell Douglas, supra,* by examining the defendant's violation-of-work-rule justification.

8. In 1991, the Civil Rights Act (hereafter the "Act") was amended, expanding the coverage of 42 U.S.C. § 1981 to include claims for intentional racial discrimination in "the making, performance, modification, and termination of [employment] contracts," as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Prior to The Act's enactment, the Supreme Court of the United States narrowly construed the right "to make and enforce contracts" as that language is used in § 1981, holding that § 1981 "does not extend ... to conduct by the employer after the contract relation has been established," unless a claim was for denial of a promotion which "involved the opportunity to enter into a new contract with the employer." *Patterson v. McLean Credit Union,* 491 U.S. 164, 177 & 185, 109 S.Ct. 2363 & 2377, 105 L.Ed.2d 132 (1989). The Act single-handedly reverses *Patterson* and its progeny.

Hence, an aggrieved employee now may alternatively seek recourse under Title VII and § 1981. The court notes that suits for racial discrimination predicated on § 1981 generally are favored over Title VII: Damages for compensatory and punitive damages are not capped if the employee-plaintiff can recover under § 1981, and the employee-plaintiff may circumvent Title VII's administrative mechanisms, which encour-

age reconciliation without a lawsuit. *See* 42 U.S.C. § 1981a(b)(3), which caps damages available under Title VII from $50,000 to $300,000, depending upon the size of the employer's workforce; *See also id.* at (b)(4), which specifically states that "[n]othing in this section shall be construed to limit the scope of, or the relief available under [§ 1981]."

9. The court notes that the plaintiff also asserts that "[a]t the time of termination, Plaintiff was still not paid what his white co-workers were paid." Pl.'s Compl. at ¶ 8. Specifically, the plaintiff claims that Roger Killingsworth, whom the plaintiff had trained, received a higher hourly wage than he. Pl.'s Dep. at 75; Pl.'s Answers to Def.'s Interrogs. at ¶ 13. In the complaint, however, the plaintiff only seeks relief for wrongful termination, not discrimination in pay.

Even assuming that the plaintiff seeks redress for discrimination in pay, the plaintiff did not raise this claim in his EEOC charge nor is it related to the wrongful termination claim. *See Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1569 (11th Cir.1987) (holding that the scope of a judicial complaint under Title VII is limited to the acts of discrimination contained in the EEOC charge or claims " 'like or related' " to those included in the charge). By limiting the scope of his charge to allegations of wrongful termination, the plaintiff has waived any right to allege discrimination in pay. Moreover, the applicable statute of limitations, discussed *infra,* precludes the plaintiff from asserting a discrimination-in-pay claim under § 1981.

§ 1981 claims is determined by borrowing the personal injury statute of limitations from the state in which the federal court is sitting. *Baker v. Gulf & Western Indus., Inc.*, 850 F.2d 1480, 1481 (11th Cir.1988) (*citing Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)).

In Alabama, a personal injury action must be brought within two years of the alleged harm. Ala.Code § 6–2–38(1) (1975). Here, the act of which the plaintiff complains, i.e., termination of employment, occurred on July 30, 1992. Because the plaintiff did not file his complaint until December 28, 1994, more than two years after the date of his discharge, the court finds that the plaintiff's § 1981 claim is untimely.[10] Accordingly, the court finds that the defendant's motion for summary judgment as to the plaintiff's § 1981 claim is due to be granted.

## CONCLUSION

For the foregoing reasons, the court finds that the defendant's motion for summary judgment is due to be granted.

---

**10.** The court also notes that "timely filing of an employment discrimination charge with the EEOC under Title VII does not toll the statute of limitations during the pendency of the EEOC charge for an action brought under Section 1981." *Jefferson v. H.K. Porter Co.*, 648 F.2d 337, 339 (5th Cir.1981).