Clara SIMS, et al., Plaintiffs, W.T. Scott, et al., Plaintiffs–Intervenors,

v.

MONTGOMERY COUNTY COMMISSION, et al., Defendants,

Albert B. Dodson, et al., Defendants–Intervenors.

Sallie WILLIAMS and Johnie Love, Plaintiffs,

v.

MONTGOMERY COUNTY SHERIFF'S DEPARTMENT, et al., Defendants,

Albert B. Dodson, et al., Defendants–Intervenors.

Civil Action Nos. 3708–N, 82–T–717–N.

United States District Court, M.D. Alabama, Northern Division.

July 2, 1996.

Rick Williams, David G. Flack, Montgomery, AL, for Dodson intervenors.

Thomas T. Gallion, III, Haskell, Slaughter & Young, Montgomery, AL, for Montgomery County Commission & David Stockman.

Thomas T. Gallion, III, Haskell, Slaughter & Young, Montgomery, AL, Kenneth L. Thomas, Tyrone C. Means, Thomas, Means & Gillis, P.C., Montgomery, AL, for Montgomery County Commission.

Delores Boyd, Montgomery, AL, court appt'd for named pltfs, named pltf-intervenors & Sims/Scott classes.

Sylvester Hardy, Montgomery, AL, pro se.

Alvah Reid, Sr., Montgomery, AL, pro se.

Sally Williams, Montgomery, AL, pro se.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

This litigation involves claims of race and sex discrimination against defendant Sheriff's Department for Montgomery County, Alabama. On August 11, 1995, the court approved and entered a consent decree outlining the procedure for selecting a new administrator for the Montgomery County Jail. Under the agreement, "subject-matter experts," which are also known as "SME's," were to interview the top five candidates for the position, and the sheriff would then choose a jail administrator. After interviewing the candidates, the SME's unanimously concluded that none of the candidates was qualified to be jail administrator. On September 22, 1995, defendant Montgomery City–County Personnel Board filed a motion, later joined in by the Sheriff's Department, requesting that the court modify the consent decree to allow the department to hire an interim administrator, re-open the search for candidates, and develop a new analysis of the qualities needed to be jail administrator. A hearing was held on the motion on January 25, 1996.

## I. BACKGROUND

### A. *Introduction*

The Sheriff's Department is divided into two divisions: corrections and law enforcement. The corrections division is responsible for operation of the county jail which has almost 100 employees and a capacity of approximately 300 inmates. The sheriff is responsible for selecting the jail administrator. Below the jail administrator in respective rank are captains, lieutenants, sergeants, and correctional officers.

The Sheriff's Department has been the subject of two long-running class-action lawsuits: *Sims v. Montgomery County Comm'n,* civil action no. 3708–N (M.D.Ala.), and *Williams v. Montgomery County Sheriff's Dept.,* civil action no. 82–T–717–N (M.D.Ala.). The principal parties to these cases are as follows:

*The Sims plaintiffs:* They brought the *Sims* case in 1972 on behalf of a class of African–American employees, charging that the hiring and promotion procedures used by the Montgomery County discriminated against black persons.[1] A year later, the court entered a consent decree submitted by the parties requiring that "all

---

1. See *Sims v. Montgomery County Comm'n,* 686 F.Supp. 878 (M.D.Ala.1988) (discussing partial history of Sims litigation).

hiring and personnel practices, programs and procedures" must be conducted "on a non-discriminatory basis without regard to race, color, creed or national origin."[2]

*The Scott intervenors:* They are four African–American officers in the Sheriff's Department who, in 1988, intervened in *Sims,* charging that the department was continuing to discriminate against black officers. The court certified a new plaintiff class, the Scott class, consisting of all past, present, and future black officers in the Sheriff's Department.[3]

*The Williams plaintiffs:* They are two women who represent a certified class of "all past, present, and future female employees of the Montgomery County Sheriff's Department." *Johnson v. Montgomery County Sheriff's Dept.,* 99 F.R.D. 562, 566 (M.D.Ala.1983). The *Williams* case was filed in 1992 by Lois Johnson, and was previously styled *Johnson v. Montgomery County Sheriff's Dept.* The style changed when Sallie Williams and Johnie Love replaced Johnson as plaintiffs. In 1985, the court approved and entered a consent decree prohibiting the department from discriminating against its female officers and requiring that it adopt new, nondiscriminatory policies with regard to promotions, transfers, and job and shift assignments. *Johnson v. Montgomery County Sheriff's Dept.,* 604 F.Supp. 1346 (M.D.Ala.1985).

*The Dodson intervenors:* They are a group of white male officers who were permitted to intervene as defendants in this litigation in 1990.[4] Two years later, the court certified the Dodson intervenors as a class for the purpose of challenging promotion procedures within the department.[5]

*The defendants:* The defendants include the Montgomery County Sheriff's Department and its sheriff; the Montgomery County Commission and its Commissioners; and the Montgomery City–County Personnel Board.

In 1990, in response to new claims brought by the Scott intervenors and the *Williams* plaintiffs, the court entered a memorandum opinion holding that the Sheriff's Department was continuing to discriminate against its black officers. *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052 (M.D.Ala. 1990). A permanent injunction prohibiting the department from further racial discrimination and requiring the department to change its personnel procedures was also entered. *Id.* at 1102–03. The court found that, "In a county that is over 30% black in population, no black person as of 1988 had ever been promoted on the enforcement side of the department; no black officer had ever supervised a white officer in the enforcement division," and "only five persons have been promoted on the corrections side." *Id.* at 1085. The court further found that, "to compound this bleak picture, it appears that blacks are not only restricted to the lowest rank, they are also concentrated in the corrections division of the department, the less prestigious of the department's two divisions. Fifty-nine or 77% of the 76 officers in corrections were black; and only 15 or 19% of 78 officers in enforcement were black." *Id.*

The court also held that the department had discriminated and retaliated against its female employees, and entered a permanent injunction prohibiting the department and its officers from engaging in further sexual discrimination and retaliation, and requiring the Department to take affirmative and immediate steps to address sexual harassment and discrimination within the department. *Sims,* 766 F.Supp. at 1079–80. The court found, among other things, that "the administrator of the county jail, Willie McKitt, was guilty of unsavory and unwelcome sexual advances towards female officers." *Id.* at 1071. The court wrote that,

"Beginning in 1986, he sexually harassed a female corrections officer, often in front of other officers. Shortly after the female officer came to the corrections division, McKitt called her 'fat ass.' The female officer corrected McKitt by telling him her

---

**2.** Order of March 22, 1973.

**3.** Order of November 2, 1988.

**4.** Order of November 27, 1990.

**5.** Order of May 18, 1992.

name, but McKitt ignored her response. On a later occasion, McKitt grabbed her buttocks. She told him not to touch her, but he just laughed and said 'If you had been nicer to me, me and you could meet and had something going on by now.' He added that 'Your husband won't know.' On another occasion, McKitt wrote 'FA' on a note pad in her view, laughed, and walked off. On another occasion, McKitt approached her as she was standing up and said 'Look at that ass.... It's so fat and firm ... It's not like the rest of these flabby asses around here ... I just know it's soft.' And on yet another occasion, when she went to McKitt's office to pick up her check, he said in front of another officer, 'Look at all that fat ass.... Look at all that fat ass. You can even have my check.' "

*Id.* (footnotes omitted). The court further stated that the "department's harassment of female officers was not, however, limited to [McKitt]. Indeed, [McKitt] set the stage for the other male officers; [he] created an environment in which all men in the department could feel free to engage in sexual harassment at their pleasure. Men at all levels engaged in such conduct." *Id.* at 1072.

## B. *1995 Consent Decree*

John Veres is an industrial psychologist and test developer at the Center for Business and Economic Development at Auburn University in Montgomery and has served as a consultant to the jail for almost ten years.[6] In April of 1991, Veres met with Sheriff Dan Jones to discuss the qualities that would be desired in a new jail administrator, because McKitt was due to retire in November 1992.[7] Veres suggested that, because McKitt had a poor reputation as an administrator, the Center should bring in outside experts to perform a strategic job analysis.[8] Sheriff Jones responded that he was happy with McKitt's

performance, and that McKitt should be used as the primary input for qualifications the position required. Even though Veres preferred outside experts, he did not have any objective data to support his preference and believed at that time that it was possible to perform a proper strategic job analysis using McKitt as the primary input source.[9] Veres and his staff performed a strategic job analysis based on the information provided by McKitt and developed an assessment tool.[10]

Prior to McKitt's retirement, the Montgomery City–County Personnel Department issued a job announcement for the jail administrator position specifying minimum qualifications needed to apply.[11] The assessment tool developed by the Center was administered to the 13 candidates who applied for the position. The candidates were rated on a scale from one to five: 1–clearly unacceptable; 2–marginal; 3–clearly acceptable; 4–good; and 5–clearly superior.[12] The candidates and their scores were as follows:[13]

| | | |
|---|---|---|
| 1. | Landreau, W. | 4.00 |
| 2. | Charles, J. | 3.60 |
| 3. | Robinson, W. | 3.48 |
| 4. | Ingram, J. | 3.39 |
| 5. | Hopper, J. | 3.08 |
| 6. | Norred, E. | 2.96 |
| 7. | Johnson, E. | 2.90 |
| 8. | Brooks, D. | 2.84 |
| 9. | Crumpton, A. | 2.78 |
| 10. | Thompson, L. | 2.63 |
| 11. | McDermott, M. | 2.41 |
| 12. | Savage, G. | 2.31 |
| 13. | Morrison, J. | 2.00 |

After the Personnel Department certified the top five candidates to Sheriff Jones for his consideration, two of the top five candidates, Ingram and Hopper, declined to be interviewed and told Jones they were no longer interested in the position.[14] Jones then interviewed the three remaining candidates and chose Landreau, who was the top scoring candidate on the test and was the administra-

---

**6.** Joint evidentiary record, filed December 7, 1995, Document number 2 at 2 (R. 2 at 2).

**7.** R. 1 at 27.

**8.** *Id.* 27–28.

**9.** Hearing of January 25, 1996, at 69.

**10.** R. 1 at 71.

**11.** R. 11 at 3; R. 13.

**12.** R. 41 at 147; R. 23.

**13.** *Id.*

**14.** R. 11 at 3; R. 15; R. 16.

tor of a jail in Russell County, Alabama.[15] Landreau accepted the position but later changed his mind and declined the job.[16]

After Landreau declined the job, the Personnel Department certified a new list of candidates to Sheriff Jones, which included the two he had interviewed and not offered the job and the individuals who ranked sixth, seventh, and eighth out of the 13 applicants: Charles, Robinson, Norred, Johnson, and Brooks.[17] At the same time, former administrator McKitt contacted the jail and made an unsolicited offer to end his retirement and return to the jail administrator position.[18] Sheriff Jones appointed McKitt to be the administrator again.[19] The *Williams* plaintiffs opposed the appointment and moved to enjoin it.[20] McKitt then decided to withdraw his offer.[21] Since the beginning of 1993, the jail has been run by co-interim administrators, Captains Norred and Gina Savage.[22]

In early 1994, Sheriff Jones requested that Veres develop a structured oral interview procedure for evaluating the five remaining candidates.[23] After the interview procedure was completed, Jones contacted the five remaining candidates and scheduled interviews. Shortly thereafter, Jones canceled the interviews.[24] On December 22, 1994, the *Williams* plaintiffs filed a motion charging that the failure of Sheriff Jones to select Brooks or Robinson for the jail administrator position was a pretext for sex discrimination.[25] On May 16, 1995, these plaintiffs amended their motion to add claims that the sheriff's refusal to make a selection violated previous consent decrees in the *Sims* and *Williams* cases.[26] In an effort to resolve the situation, the *Williams* plaintiffs and all defendants, except the Personnel Board, entered into a settlement agreement under which outside SME's would administer the structured oral interview developed by the Center and rank the candidates.[27] Upon receiving a rank ordered list of the candidates from the SME's, Sheriff Jones would select a candidate within 30 days.[28] Because Jones was concerned about the preparedness of the candidates to fill the position, the settlement extended the customary probationary period from six to 12 months.[29] The settlement agreement was approved by the court on August 11, 1995, and incorporated into a consent decree.[30]

### C. *Interviews by the SME's*

The panel of SME's consisted of three experienced jail administrators from other Southern states: Sally Graham, a white female; Mark Fitzgibbons, a white male; and Darnley Hodge, a black male. No party contends the SME's were biased.[31] The following four candidates chose to interview for the position: Eddie Norred, Jr., a white male; Wanda Robinson, a black female; Debra Brooks, a black female; and Ervin Johnson, a black male.[32] Norred is a captain and Robinson is a lieutenant in the Montgomery County Jail;[33] Brooks is an instructional assistant in a county high school,[34] and Johnson works for the Montgomery County Youth

**15.** R. 11 at 3; R. 56 at 72–79.

**16.** R. 11 at 14; R. 17; R. 25.

**17.** R. 14 at 4; R. 20.

**18.** R. 11 at 4; R. 57 at 12, 13.

**19.** R. 49.

**20.** *Id.*

**21.** R. 11 at 4; R. 57 at 19, 20.

**22.** Transcript of hearing on January 25, 1996, at 36.

**23.** R. 1 at 5, 6; R. 2 at 3; R. 11 at 4.

**24.** R. 11 at 4, 5.

**25.** R. 5 at 2.

**26.** *Id.*

**27.** R. 5.

**28.** *Id.* at 5.

**29.** *Id.*

**30.** *See* order of August 11, 1995.

**31.** Hearing of January 25, 1996, at 31.

**32.** R. 36.

**33.** Hearing of January 25, 1996, at 20, 129; R. 28, 31.

**34.** *Id.* at 140.

Facility.[35] Candidate Charles chose not to interview for the position.[36]

The oral interviews were performed by the SME's on August 28, 1995.[37] The candidates were rated on each question on a scale of one to five, and a composite score was generated for each candidate.[38] A candidate could not score lower than one on a given question. The scale and the overall scores for each candidate were as follows: [39]

5–superior 4–good 3–average 2–poor 1–unacceptable

| | |
|---|---|
| Norred | 2.71 |
| Robinson | 1.93 |
| Brooks | 1.89 |
| Johnson | 1.45 |

SME's Graham, Fitzgibbons, and Hodge were not asked to assess the competence of the candidates.[40] However, after they had completed the interviews, the SME's unanimously decided to contact the Center staff person who oversaw the interview process to convey their opinion that none of the candidates was qualified to be a jail administrator.[41]

The following is detailed review of the qualifications of the three SME's and their comments about the candidates. In 1979, Graham, a white female, became the first woman in Florida to be appointed as director of a detention facility. She served as administrator for six years of a facility similar in size to the one in Montgomery County.[42] From 1989 to 1994, she served as the Manager of Training and Staff Development for the Orange County, Florida Corrections Division, which is the ninth largest detention system in the United States.[43] She is currently Manager for Policy and Operations Review in Orange County.[44]

In evaluating the candidates, Graham stated that "I have rated approximately 60 to 70 people for this type of position over the past 10 years or so, and I have never seen applicants show such a lack of ability to express themselves as these candidates; ... if any of these candidates had any familiarity with laws or accreditation they did not verbalize it in their answers." [45] She further stated that "as jail professionals the other panel members and I felt compelled, ... indeed, we begged [the Center staff person who oversaw the process] to report in her letter to the Personnel Department that we all agreed that none of the candidates showed even a hint of understanding the kind of job necessary to adequately manage the jail." [46]

During her five years as Manager of Training and Staff Development for the Orange County Corrections Division, Graham received national awards as a trainer of jail personnel.[47] She stated that, "in my opinion, of the candidates we interviewed, only the candidate we recommended (Eddie Norred) has a chance, and I emphasize the word 'chance,' of actually rising to the level of being a minimally qualified jail administrator if given a year's training. I do not believe any of the other candidates could rise to the level of being a minimally qualified jail administrator even with a year's training." [48] Even regarding Norred, Graham was not enthusiastic. She stated that "as a matter of our own credibility [the SME's] did not want to give the impression that we felt the person we recommended (Eddie Norred) was acceptable and could do the job, when we felt strongly he could not." [49] After a conversation with the attorney for *Williams* plaintiffs, Graham issued a second affidavit stating that, because of her unfamiliarity with the litigation and its circumstances, she would

35. *Id.* at 125.

36. R. 36.

37. *Id.*

38. *Id.*

39. *Id.*

40. R. 6 at 7.

41. *Id.*

42. *Id.* at 2.

43. *Id.*

44. *Id.*

45. *Id.* at 5.

46. *Id.* at 6.

47. *Id.* at 2–3.

48. *Id.* at 8.

49. *Id.* at 7.

not say the candidates could never be adequately trained. However, she could not say how long it would take to train them.[50]

SME Fitzgibbons, a white male, has been a jail administrator for nine years.[51] He is currently Director for the Beaufort County, South Carolina Detention Center, which is comparable in size to the Montgomery County Jail.[52] Fitzgibbons has held high level offices in the American Jail Association and has served as president of the South Carolina Jail Association.[53] Overall, Fitzgibbons was not impressed with the interview performance of any of the candidates and stated that "I personally would not hire any of the candidates to work for me even as a correctional officer."[54] Fitzgibbons said that the SME's agreed that Norred was the "least worst" of the candidates, probably because of his prior experience with budgeting.[55] However, "even for Norred it would take an outstanding program from the National Institute of Corrections or another top-notch organization to bring him up to the level of being minimally qualified. Even then I do not know whether he (or anyone) is capable of absorbing that much material in that period of time, putting it to use on the job, and leading and training others."[56]

SME Hodge, a black male, is Regional Jail Superintendent of the Riverside Regional Jail in Virginia.[57] Although Riverside is a much larger facility than the Montgomery County Jail, Hodge served from 1988 to 1994 as administrator of a jail comparable in size and staffing needs to the Montgomery County Jail.[58] Hodge stated that, "Based on the interview performance of *these* candidates, I personally would not hire any of the candidates as *deputy* superintendent/deputy administrator; and I frankly doubt I would hire any of them to work for me even as a captain or lieutenant."[59] Hodge stated that he could not determine how long it would take to train these candidates to be minimally qualified because they lacked so many basic skills needed as a prerequisite for training to be a top administrator.[60]

SME's Graham, Fitzgibbons, and Hodge also recommended against having an unqualified person serve for any period of time as jail administrator, especially in an overcrowded facility such as the Montgomery County Jail. Hodge stated that "it is my understanding that in Montgomery County, the position of jail administrator has been vacant for about three years, and the jail is being run by two captains, one of whom we rated unqualified for the position[;] ... this bad situation [would be] compounded by requiring the Sheriff to hire an administrator who is not even minimally qualified."[61]

### D. *Veres's Change in Opinion*

The structured oral interview process changed the opinion of Veres regarding the competency of the candidates to be jail administrator. Prior to the SME interviews, Veres believed that the top five candidates were minimally qualified because they had scored fairly well on the first test designed to rank the 13 candidates who applied for the position.[62] Veres now believes that the first test was "pitched at too low a level."[63] He has changed his opinion for two reasons.[64] First, he stated that the test scores of the candidates on the structured interviews were

---

50. *See* Notice of filing of supplement to evidentiary record in jail administrator litigation, filed January 2, 1996. R. 65 at 2–4.

51. R. 7 at 2.

52. *Id.* at 2–4.

53. *Id.* at 4.

54. *Id.* at 7.

55. *Id.* at 8; R. 66 at 2.

56. R. 7 at 8–9.

57. *See* Notice of filing of supplement to evidentiary record in jail administrator litigation. R. 64.

58. *Id.* at 2–3.

59. *Id.* at 5 (emphasis in original).

60. *Id.* at 6.

61. *Id.* at 7.

62. Hearing of January 25, 1996, at 77–78.

63. *Id.* at 77; R. 2 at 3; R. 3 at 4.

64. Hearing of January 25, 1996, at 78.

"abysmally low" and were "literally the lowest observed on a selection procedure I've seen over my career as a test developer."[65] Over his career, Veres has developed, evaluated, and supervised the development of over 100 selection procedures involving a structured oral interview or similar assessment device.[66] Second, Veres was strongly persuaded by the fact that SME's Graham, Fitzgibbons, and Hodge volunteered that all the candidates they interviewed were incompetent, even though the SME's were only asked to rank the candidates.[67]

Veres stated that, under McKitt "a very sick organizational culture developed and flourished in the [Montgomery County] jail," and all of the current candidates are a product of that culture.[68] Veres believes the jail is poorly run and is "a mess."[69] Consequently, he believes that the only way to improve the jail is to modify the consent decree to re-open the search for candidates for the jail administrator position.[70]

On September 22, 1995, the Personnel Board filed a motion requesting that the court modify the 1995 consent decree to allow the department to hire an interim administrator, re-open the search for candidates, and develop a new analysis of the qualities needed to be jail administrator. In a pretrial order entered on November 17, 1995, all other defendants, including the Sheriff's Department, joined in and adopted the motion to modify.

## II. DISCUSSION.

### A. *Preliminary Issue*

Because the *Williams* plaintiffs were the only plaintiffs to sign the agreement incorporated into the 1995 consent decree, only they have formally and actively opposed the motion to modify the consent decree. The *Sims* plaintiffs and the Scott intervenors have "concurred" with *Williams* plaintiffs' position but have not actively participated in the pro-

ceedings regarding the motion.[71] The Dodson intervenors have not voiced a position.

The *Williams* plaintiffs contend that the court should not even consider the issue of modification of the consent decree because the motion was filed by the Personnel Board, which was not a signatory to the agreement upon which the decree was based. *See Vogel v. City of Cincinnati,* 959 F.2d 594, 598 (6th Cir.) (a consent decree "is not enforceable directly or in collateral proceedings by those who are not parties to it"), *cert. denied,* 506 U.S. 827, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992); *Sims v. Montgomery County Comm'n,* 873 F.Supp. 585, 598–99 (M.D.Ala.1994) (same). The court rejects this argument because, in the pretrial order entered on November 17, 1995, all other defendants, including the Sheriff's Department, joined in and adopted the motion to modify.

### B. *Standards for Modification of a Consent Decree*

■ Modification of a consent decree, like modification of any judgment or order, is formally governed by Rule 60(b) of the Federal Rules of Civil Procedure. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 380, 112 S.Ct. 748, 757, 761, 116 L.Ed.2d 867 (1992). Rule 60(b) authorizes a court to modify a final judgment or court order at any time if it finds that "the judgment has been satisfied, ... or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application, or [for] any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(5)–(6).

Traditionally, courts had required parties seeking modification of a consent decree under Rule 60(b) to demonstrate that continued application of the decree would result in "grievous wrong" on account of new and unforeseen conditions. *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460,

---

**65.** *Id.*

**66.** R. 2 at 8.

**67.** Hearing of January 25, 1996, at 82–83.

**68.** R. 1 at 37.

**69.** Hearing of January 25, 1996, at 96.

**70.** R. 3 at 4; Hearing of January 25, 1996, at 98.

**71.** Hearing of January 25, 1996, at 3–4.

464, 76 L.Ed. 999 (1932). In recent years, however, the *Swift* standard has been rejected as too rigid for "institutional reform litigation." *See, e.g., Hodge v. HUD*, 862 F.2d 859 (11th Cir.1989) (per curiam); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114 (3d Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). The Supreme Court's decision in *Rufo* established a two-part standard for determining when modification of such decrees is appropriate. 502 U.S. at 383–384, 112 S.Ct. at 760. First, the party seeking modification of the decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383, 112 S.Ct. at 760. The party may satisfy this initial burden "by showing either a significant change in factual conditions or in law." *Id.* at 384; 112 S.Ct. at 760. The Court identified several situations in which a significant change in factual conditions could warrant modification of a decree. Modification could be appropriate where a change in conditions has made compliance with the decree "substantially more onerous." *Id.* Modification could also be appropriate "when a decree proves unworkable because of unforeseen obstacles," or, lastly, "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* While the change in circumstances need not have been unforeseeable, it must at least have been unforeseen: "Ordinarily, ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.*

Second, if the moving party meets this standard, the court then considers "whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383, 112 S.Ct. at 760. Any modification to the decree must be directly responsive to the problem created by the changed circumstances. *Id.* at 391–392, 112 S.Ct. at 764. The *Rufo* court recognized that, in applying this two-part standard, a court must take into consideration the effect of the proposed modifications on the underlying purpose of the consent decree. Where the defendant requests a modification that is clearly designed to further the goals of the decree, for example, the court may be more flexible in its application of the two-part test. *Id.* at 381 n. 6, 112 S.Ct. at 758 n. 6. If the modification would in any manner frustrate or undermine the decree's purpose, the court must proceed with extreme caution in reviewing the justification for the proposed changes. *Id.* at 388, 112 S.Ct. at 762; *see also Hodge*, 862 F.2d at 864.

### C. *Applicability of Rufo*

■ The *Williams* plaintiffs contend that, in determining whether to modify the decree, the court should apply the inflexible standard of *Swift* rather than the flexible standards of *Rufo*. The Eleventh Circuit Court of Appeals has recently clarified that *Swift* applies to cases where the " 'facts are so nearly permanent as to be substantially impervious to change,' " while *Rufo* applies to consent decrees in institutional reform litigation where there have been changes in facts or law. *United States v. City of Miami*, 2 F.3d 1497, 1503 (11th Cir.1993) (quoting *Swift*, 286 U.S. at 114–115, 52 S.Ct. at 462).

There can be no question that the *Sims* and *Williams* cases involve long-term institutional reform litigation. The *Sims* lawsuit alleging race discrimination in the Sheriff's Department was filed in 1972, and the *Williams* lawsuit alleging sex discrimination was filed in 1982. Over the years, this court has issued numerous orders seeking essentially to reform the Sheriff's Department, that is, to rid it of discrimination based on race and gender. *See Sims v. Montgomery County Comm'n*, 890 F.Supp. 1520 (M.D.Ala. 1995); *Sims v. Montgomery County Comm'n*, 887 F.Supp. 1479 (M.D.Ala.1995); *Sims v. Montgomery County Comm'n*, 873 F.Supp. 585 (M.D.Ala.1994); *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052 (M.D.Ala.1990); *Sims v. Montgomery County Comm'n*, 686 F.Supp. 878 (M.D.Ala.1988); *Johnson v. Montgomery County Sheriff's Dept.*, 604 F.Supp. 1346 (M.D.Ala.1985). The facts that gave rise to these orders are not, and should not be, " 'permanent' " and " 'substantially impervious to change.' " *City of Miami*, 2 F.3d at 1503 (quoting *Swift*, 286

U.S. at 114–115, 52 S.Ct. at 462). To the contrary, the goal of this court, as reflected in these orders, has been to effect a change in the factual circumstances that lead to the orders so that the orders will no longer be necessary. Indeed, in a memorandum opinion entered on July 3, 1995, this court wrote that "it is now time that the parties contemplate an end, in the near future, to this litigation to the extent it involves the Montgomery County Sheriff's Department and its officials.... A court's end purpose in *institutional litigation, such as this,* is to remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law." *Sims,* 890 F.Supp. at 1534–35 (emphasis added). *See also Missouri v. Jenkins,* — U.S. —, —, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts,* 503 U.S. 467, 489–91, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992). *Rufo*'s flexible standards for decree modification apply here.

### D. *Whether a Change in Circumstances Occurred*

■ The party seeking modification of the decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo,* 502 U.S. at 383, 112 S.Ct. at 760. As previously stated, first, any change in facts must have been unforeseen at the time the parties entered the decree, *id.* at 385, 112 S.Ct. at 761, and, second, compliance with the decree must either be "substantially more onerous, ... unworkable because of unforeseen obstacles, ... [or] detrimental to the public interest," *id.* at 384, 112 S.Ct. at 760. The court finds that an unforeseen change in facts has occurred which would make compliance with the 1995 consent decree detrimental to the public interest.

### 1. *Whether the Change Was Unforeseen*

■ As stated, to modify a consent decree, a change in facts must have been unforeseen but need not necessarily have been unforeseeable. *Id.* at 384, 112 S.Ct. at 760. In deciding to enter the consent decree, the Sheriff's Department relied on the opinion of Veres and the Center for Business and Economic Development that the five remaining candidates for the jail administrator position were at least minimally qualified.[72] On the first test administered by the Center, the 13 candidates were rated on a scale of one to five with a score of three or better being considered acceptable.[73] The scores of the top five remaining candidates at the time the department entered into the consent decree were as follows:[74]

| | | |
|---|---|---|
| 1. | Charles | 3.60 |
| 2. | Robinson | 3.48 |
| 3. | Norred | 2.96 |
| 4. | Johnson | 2.90 |
| 5. | Brooks | 2.84 |

In sum, all of the candidates scored above or very close to the acceptable range on the first test. Although Veres had stated to Sheriff Jones as early as 1991 that he preferred using outside evaluators to perform a strategic job analysis for the jail administrator position, Veres believed that a proper job analysis could be performed using McKitt as the sole input.[75] Veres also believed that the selection procedures developed from the job analysis were content valid.[76] While Sheriff Jones was concerned about the leadership abilities of the remaining candidates, Veres discounted those concerns because leadership is an amorphous concept, and Veres had no objective data to indicate that the remaining candidates were not minimally qualified.[77]

After the SME interviews, Veres changed his opinion and now believes that the initial test was "pitched too low" and that none of the candidates is minimally qualified for the position.[78] Veres has changed his opinion for two reasons.[79] As stated, he believes that

---

72. Hearing of January 25, 1995, at 77–78.

73. R. 23

74. *Id.*

75. R. 1 at 27–28; Hearing of January 25, 1996, at 69.

76. Hearing of January 25, 1996, at 69.

77. *Id.* at 72.

78. *Id.* at 95; R. 2 at 3; R. 3 at 4.

79. Hearing of January 25, 1996, at 78.

the test scores of the candidates on the structured oral interviews were "abysmally low" and were "literally the lowest observed on a selection procedure I've seen over my career as a test developer." [80] Veres pointed out that, of the four candidates who took the test, none even scored "average," and three of the four scored below "poor." [81]

In addition, Veres was strongly persuaded by the fact that, although SME's Graham, Fitzgibbons, and Hodge were asked only to rank the candidates, they decided to contact the Center staff member overseeing the interview process to recommend that none of the candidates be appointed as jail administrator.[82] SME Graham stated that "we begged [the person overseeing the process] to report in her letter to the personnel department that we all agreed that none of the candidates showed even a hint of understanding the kind of job necessary to adequately manage the jail." [83] Graham further stated that "I have rated approximately 60 to 70 people for this type position over the past 10 years or so, and I have never seen applicants show such a lack of ability to express themselves as candidates ... if any of these candidates had any familiarity with laws or accreditation they did not verbalize it in their answers." [84] SME Hodge stated that, "based on the interview performances of these candidates, I personally would not hire any of the candidates as deputy superintendent/deputy administrator; and I frankly doubt I would hire any of them to work for me even as a captain or lieutenant." [85] Similarly, SME Fitzgibbons stated that "I personally would not hire any of these candidates to work for me even as a correctional officer." [86] As a result of these statements by the SME's, Veres changed his opinion about the qualifications of the candidates and recommends that none be made jail administrator.[87] He now believes that modifying the

consent decree to re-open the search is the only way to hire a qualified administrator.[88]

Given Veres's experience in developing tests, his experience as a consultant to the jail, and his familiarity with the candidates, the court concludes that the change in Veres's opinion regarding the qualifications of the candidates was a change in facts unforeseen at the time the Sheriff's Department entered the consent decree.

### 2. Detriment to the Public Interest

■ For the court to permit modification of the consent decree, as stated, it must determine that the change in facts makes compliance either substantially more onerous, unworkable because of unforeseen obstacles, or detrimental to the public interest. *Rufo*, 502 U.S. at 384, 112 S.Ct. at 760. The court finds that, based upon the information provided by SME's Graham, Fitzgibbons, and Hodge and the change in opinion of Veres, compliance with the current consent decree would be detrimental to the public interest. The persuasiveness of the structured oral interview procedure hinges on its validity. The *Williams* plaintiffs have challenged the validity of the structured interview procedure by arguing that many of the questions were inappropriate, the questions on budgeting gave an unfair advantage to Norred, and the SME opinions are subjective rather than objective data.

The questions on the test were developed by Veres and his staff at the Center for Business and Economic Development based in part on input from SME's.[89] Although Veres has never previously developed a test for selecting a jail administrator, he has developed, evaluated, and supervised the development of over 100 selection procedures involving a structured oral interview or similar

---

80. *Id.*

81. Hearing of January 25, 1996, at 51.

82. *Id.* at 82–83.

83. R. 6 at 6.

84. *Id.* at 5.

85. R. 64 at 5.

86. R. 7 at 7.

87. R. 2 at 3; R. 3 at 4.

88. R. 3 at 4.

89. R. 2 at 4–5.

assessment device.[90] The questions measured the knowledge, skills, and abilities—that is, the KSA's—not covered by the first testing instrument.[91] These KSA's included knowledge of court systems and procedures, knowledge of personnel policies and procedures, knowledge of detention facility procedures, knowledge of inmate rules and regulations, and ability to assess the Montgomery County Jail's operating requirements.[92] SME Hodge stated that "I thought nearly all of the questions developed by AUM were excellent, particularly those questions concerning court procedures, developing inmate rules and regulations, inmate grievance procedures, and employee policies and procedures; and developing administering budgets."[93]

The *Williams* plaintiffs contend that the questions on budgeting gave an unfair advantage to Norred because he was the only candidate with prior experience in developing a budget. However, the scoring data demonstrate that Norred performed only slightly better on the budgeting questions than the other candidates.[94] Even if the budgeting questions had been eliminated and the examinations rescored, the rank order of the candidates would not have changed.[95] With rescoring and reweighing to exclude the budget questions, the only candidate whose overall score on the test would improve would be Robinson, and her overall score would rank slightly below "poor."[96] Furthermore, SME Fitzgibbons stated that he thought the questions on how to reduce a budget were excellent.[97] Fitzgibbons stated that the budgeting question involved "more common sense than

anything" and that "anyone who has worked in corrections for more than a few years (and without even developing or administering a budget) should know that a large majority (over 75%) of a jail budget goes to staffing, and in order to reduce the budget by 10 percent you must take a hard look at staffing."[98] Fitzgibbons was disappointed that "none of the candidates picked up on that."[99]

Finally, the court finds that the structured SME interviews produced data that are trustworthy and credible. The *Williams* plaintiffs argue that the court should give less weight to the opinions of the three SME's because the opinions are subjective, and "An infinite number of subjective opinions does not an objective standard make."[100] However, the SME interviews were carefully designed to minimize bias and provide objective evaluation of the candidates.[101] The panel of SME's was race and gender balanced so that it included one black male, one white female, and one white male.[102] The SME's were impartial in that none is from Alabama or knows any of the candidates.[103] The SME's were highly qualified in that all have managed jails in other Southern states comparable in size to the Montgomery County Jail and have evaluated candidates in the past for jail administrator positions.[104] There was very little disagreement among the SME's in their ratings of candidates.[105] The evaluations were essentially consistent across raters and items.[106] Given the impartiality of the SME's, their excellent qualifications, and their consistency in ratings, the court concludes their opinions are entitled to great weight.

---

90. *Id.* at 8.

91. *Id.* at 4.

92. *Id.*

93. R. 64 at 4.

94. R. 2 at 6.

95. *Id.*

96. *Id.*

97. R. 7 at 6.

98. *Id.*

99. *Id.*

100. *Williams* plaintiffs' pretrial brief, filed December 22, 1995, at 25.

101. Hearing of January 25, 1996, at 31.

102. *Id.*

103. *Id.*; R. 7; R. 8; R. 64.

104. R. 7; R. 8; R. 64.

105. Hearing of January 25, 1996, at 18.

106. *Id.*

It would be detrimental to the public interest to select a jail administrator from a pool of candidates who have unanimously been judged by a panel of outside experts to be unqualified for the position. The position of jail administrator requires a great deal of responsibility, particularly in an overcrowded facility such as the Montgomery County Detention Facility. As SME Fitzgibbons pointed out, "There are any number of serious incidents—e.g., suicide or other death, bodily injury, sexual or other physical assault, inmate uprisings, grossly inadequate or improper medical or psychological care, escape—for which detention facilities are at risk, and which can occur at any time." [107] The court therefore finds that placing an unqualified administrator in such a critical position would be detrimental to the public interest, and modification of the consent decree is warranted.

### E. Modifications of the Decree

After the party seeking modification satisfies its initial burden of showing modification is warranted, the court must consider "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383, 112 S.Ct. at 760. To be suitably tailored, the modification must further the underlying purpose of the consent decree and must be directly responsive to the problem created by the changed circumstances. *Id.* at 391–392, 112 S.Ct. at 764.

### 1. Proposed Modifications

The court will outline the modifications proposed by the parties and the conditions under which it accepts them. The *Williams* plaintiffs propose that the Sheriff's Department be allowed to appoint an interim jail administrator for one year and that Robinson or Brooks be appointed as administrator in training for the year.[108] At the end of the year, the administrator in training would be evaluated and would be promoted to jail ad-

ministrator if she were determined competent.[109] The defendants propose that an interim administrator should be appointed who would not apply for the permanent position.[110] They suggest that Robinson and Norred, the two top scoring candidates, be appointed as co-administrator trainees and that they receive training from the interim administrator.[111] During that time, Veres and his Center would perform a new strategic job analysis to determine the qualities needed of a good administrator.[112] The search for candidates would be re-opened, and the jail administrator position would be advertised at a higher salary range to attract applications from better candidates.[113]

The court accepts the defendants' proposed modifications with the following additional provisions: (1) All current candidates must be allowed to apply for the position after the strategic job analysis has been performed; (2) selection of a new administrator must be performed in a non-discriminatory fashion; (3) a new administrator must be selected within 15 months of the date of this order; and (4), if a new administrator cannot be selected during that time period, the defendants must petition the court for an extension and explain to the court why an administrator has not been selected.

### 2. Suitable Tailoring of the Modifications

The modifications to the consent decree are suitably tailored to the problems created by the change in facts. The principal problems are that the job-selection procedure is flawed, and none of the remaining candidates is qualified to be administrator. A strategic job analysis using external SME's will provide information to determine the qualities needed in a permanent administrator. Veres testified that he recommended as early as 1991 that a strategic job analysis be performed with input from sources other than McKitt.[114] At that time, Sheriff Jones de-

---

**107.** R. 7 at 9.

**108.** Hearing of January 25, 1996, at 12.

**109.** *Id.*

**110.** Defendants' letter to the court, filed February 6, 1996.

**111.** *Id.*

**112.** *Id.*

**113.** *Id.*

**114.** R. 1 at 27–28.

clined, and Veres believed it was possible to perform an acceptable job analysis using McKitt as the sole input.[115] Veres now believes that a new strategic job analysis is needed so that training for the new administrator can be geared toward producing a administrator capable of improving the way the jail has been operated.[116]

The second problem is obtaining a qualified permanent administrator. The modifications deal with this problem in two ways. First, Robinson and Norred will receive an opportunity to be trained by a competent administrator and improve their basic knowledge. SME's Graham, Fitzgibbons, and Hodge were astonished at the candidates' lack of basic knowledge regarding ordinary jail procedures. For example, none of the candidates knew the three types of body searches that can legally be performed at a jail and the circumstances under which each type of search can be conducted.[117]

The opportunity for Norred and Robinson to train is necessary because their current lack of knowledge is due to the inadequate on-the-job training they received as jail employees. Robinson testified that she answered the question on searches incorrectly because she just re-stated how she had been trained at the jail.[118] The poor management, training, and operating procedures at the jail are rooted in the long history of racial discrimination in the Sheriff's Department. As the court has observed, once blacks were hired, they were disproportionately hired into the corrections division of the department, which is less prestigious than the enforcement division; in 1988, 19% of the officers in enforcement were black, while 77% of the officers in corrections were black; and, by 1988, no black person had ever been promoted in the enforcement side of the division. *Sims,* 766 F.Supp. at 1085. Veres testified that the corrections division became

a "Siberia" so that "people who screwed up on the law enforcement side got sent to the jail." [119] According to Veres, this practice contributed to a "sick culture" of lack of discipline, mismanagement, and incompetence at the jail which is markedly different from the culture of the enforcement division.[120] In effect, the corrections division has become a ghetto within the Sheriff's Department. The severe short-falls in the jail's current employees, including Robinson and Norred, are products of the discriminatory practices of the Sheriff's Department; the department has yielded a generation of inadequately trained employees. Therefore, Robinson and Norred are at least entitled to training from a qualified interim administrator that may allow them to raise their skills to a point where they can be competitive with candidates from other jails.

Second, the search process will be re-opened, and the position will be advertised at a substantially higher salary. From the initial register of 13 candidates, three of the top five candidates withdrew from consideration for the position.[121] One candidate, Landreau, withdrew after he had already accepted the position.[122] In the wake of these events, the defendants performed a salary survey which indicated that the current position paid far less than comparable positions in the region.[123] It appears that the low salary was a major part of the reason a number of top candidates declined the position. The defendants now indicate they have obtained authorization to advertise the jail administrator position at a competitive salary level.[124]

A re-opening of the search process is needed because there is a substantial question as to whether any of the current candidates can be trained in a one-year period to be a competent administrator. SME Graham stated that, "in my opinion, of the candidates

---

115. *Id.* at 28; hearing of January 25, 1996, at 69.

116. R. 3 at 4.

117. R. 64 at 4.

118. Hearing of January 25, 1996 at 131.

119. R. 1 at 50.

120. *Id.* at 48–50.

121. R. 11 at 3–4.

122. *Id.*

123. 8 at 1–3.

124. *Id.*

we interviewed, only the candidate we recommended (Eddie Norred) has a chance, and I emphasize the word 'chance,' of actually rising to the level of being a minimally qualified jail administrator if given a year's training. I do not believe any of the other candidates could rise to the level of being a minimally qualified jail administrator even with a year's training." [125] SME Fitzgibbons similarly believed that Norred offered the greatest promise of any of the candidates, but said that, "even for Norred it would take an outstanding program from the National Institute of Corrections or another top-notch organization to bring him up to the level of being minimally qualified. Even then I do not know whether he (or anyone) is capable of absorbing that much material in that period of time, putting it to use on the job, and leading and training others." [126] When Veres was asked whether Robinson could be trained to be a competent administrator he stated "I am confident that eight hours a week of training for fifty-two weeks is unlikely to make [Robinson] a competent jail administrator in my opinion." [127] Despite these opinions, Graham, Fitzgibbons, and Veres all acknowledged that it is impossible to predict with certainty how an individual would respond to training and whether any of the current candidates could be trained in a year's time to be a competent administrator.[128] By providing Robinson and Norred training and re-opening the search process, the modifications are tailored to pursue two possible ways to resolve the problem of obtaining a competent administrator in a reasonable amount of time.

The court's caveat regarding non-discrimination in the selection process and opening the process to all current candidates is necessary because there are already disturbing signs of race discrimination in the selection process. In his deposition, Sheriff Jones stated that he does not consider Norred a viable candidate for the position in part be-

cause Norred is white and is dating a black woman. In his deposition, Jones first stated he did not consider Norred qualified because he has not "demonstrated the leadership or the type of character that I would hope a candidate would display" and therefore does not have the respect of the correctional officers.[129] Jones stated that Norred's lack of leadership and character stem from the fact that his "social life, his personal life have been somewhat questionable." [130] Jones stated that although no disciplinary measures have ever been taken against Norred, he has been "counseled" regarding his personal life.[131] The following exchange then took place during Sheriff Jones's deposition: [132]

"Q. Well, what sort of incidents has [Norred] been counseled about regarding his personal life?

A. ... He lives with a corrections officer of another race. This caused problems within his work—within the work force. He has shown a lack of judgement in several situations.

Q. He's white; is that correct?

A. Yes.

Q. She's black?

A. Yes.

Q. And this has caused some discord among the work force, the fact that they were living together?

A. Yes.

Q. And that was because they were of different races?

A. Right.

Q. And that was one of the reasons why there was a lack of respect for him as a leader among some of the officers?

A. Corrections officers.

Q. Corrections officers. And that was a factor that you considered that would demonstrate that he lacked leadership?

A. Yes, sir."

**125.** R. 6 at 8.

**126.** R. 7 at 8–9.

**127.** R. 1 at 31.

**128.** *Id.*; R. 65 at 2; R. 66 at 4.

**129.** R. 56 at 37–38.

**130.** *Id.* at 38.

**131.** *Id.* at 39.

**132.** *Id.* at 39–40.

The law is well established that discrimination in employment based upon interracial marriage or interracial association is prohibited under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and 42 U.S.C.A. § 1981. *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 890–891 (11th Cir.1986); *Lester v. Twitchell,* 894 F.Supp. 1511, 1514 n. 2 (M.D.Ala.1995). Therefore, it is illegal for Sheriff Jones to consider Norred's relationship with a black woman as a factor in determining whether he is competent or of appropriate character to be jail administrator.

Finally, it is necessary to place a time limit on the selection process for choosing a new jail administrator. Veres testified that it would take 9–12 months to perform the job analysis, develop new selection procedures, advertise the position, and make a selection.[133] The position of jail administrator has been vacant for over three years, and in the opinion of Veres, the jail continues to be poorly run and "a mess."[134] Therefore, the public interest would best be served by appointing a qualified permanent jail administrator as soon as possible.

### 3. *Underlying Purpose of the Decree*

As stated, any modifications to a consent decree must further rather than frustrate the underlying purpose of the decree. *Rufo,* 502 U.S. at 381 n. 6, 388, 112 S.Ct. at 758 n. 6, 762; *see also Hodge,* 862 F.2d at 864. The purpose of the 1995 consent decree was to hire the best qualified candidate in a non-discriminatory fashion. Any intent to hire the best qualified candidate presumes that the candidates are minimally qualified. In this litigation, hiring from a pool of candidates unanimously determined to be unqualified by unbiased outside administrators would frustrate a major purpose of the decree. As a result, the court concludes that the modifications would further the underlying purpose of the consent decree.

The *Williams* plaintiffs contend the court should not consider the proposed modifica-

tions because the Sheriff Jones is simply trying to avoid having a female as jail administrator. The *Williams* plaintiffs' distrust of Jones is certainly merited. The sexually and racially discriminatory environment in the Montgomery County Sheriff's Department has been egregious and longstanding. Moreover, the fact that Sheriff Jones rehired McKitt (whose prior treatment of women in the department can only be described as reprehensible) is deeply disturbing. This fact not only raises a serious question as to whether Jones appreciates how deep and pernicious sex discrimination was in the department, it also strongly suggests that Jones himself harbors a discriminatory bias against women serving as correctional officers. Nevertheless, for the compelling reasons already given, the court concludes that the reasons behind the request for modifications are not discriminatory. Sexual bias was not a motivating factor. *Cf.* 42 U.S.C.A. § 2000e–2(m) ("an unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice"). This conclusion is reinforced by the fact that two of the four candidates, Norred and Johnson, are male, and Sheriff Jones does not want to select them either. In addition, the Sheriff has appointed Gina Savage, a female, as co-interim administrator. Therefore, the court finds that the defendants' request for modifications does not stem from sexual bias.

The court also appreciates that its refusal to enforce, without modification, the 1995 consent decree could be viewed as further victimizing a victim. Robinson's lack of knowledge is due to the inadequate on-the-job training she received, and this inadequate training is a conscious product of the racially and sexually discriminatory biases of those who ran the Sheriff's Department.[135] Robinson has been wronged. But, here, "two wrongs do not make a right." To appoint Robinson as jail administrator not only would be against public interest, it would be against

---

**133.** Hearing of January 25, 1996, at 98.

**134.** *Id.* at 96.

**135.** Brooks was an employee of the Montgomery County Jail from 1985 to 1990. *Id.* at 138, 144.

her interest. The glory that she would receive from being selected as the jail administrator at this time would be short-lived, for, without the needed training and skills, she would be doomed to certain failure. This court cannot in good conscience do that to her. Instead, the Sheriff's Department must now bear the responsibility, at its own expense, of providing to Robinson the training she should have received years ago. And, of course, after receiving this training, Robinson should be prepared better to advance her career and, should she become the new jail administrator, better to serve the public as well.

Finally, it is important to note that the court itself has an interest in the modifications. As previously stated, a court's "end purpose" is to "remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law." *Sims,* 890 F.Supp. at 1534–35. It could be said that one indicator of the effectiveness of a remedial order is that it is short-lived. The Montgomery County Jail is, in the words, of Veres, "a mess." [136] The conditions there are the result of decades of gross neglect motivated substantially by racial and sexual bias. The new administrator, therefore, will have a daunting task, for he or she will not merely have to manage the jail, he or she will have to remake it, to retrain virtually all of its personnel to meet even minimum law enforcement personnel standards. If this court's "end purpose" is ever to be realized, the new administrator of the jail must be not just competent, he or she must be highly so.[137]

An appropriate judgment will therefore be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) The motion of defendant Montgomery City–County Personnel Board, as joined in by all other defendants, for leave to employ a jail administrator on an interim basis and for leave to develop a new register for the jail administrator position, filed November 22, 1995, is granted.

(2) Defendants Montgomery County Sheriff's Department, the Montgomery County Sheriff, the Montgomery County Commission, the members of the Montgomery County Commission, and the Montgomery City–County Personnel Board and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to do the following:

(A) That defendant Sheriff Dan Jones shall appoint an interim administrator within 90 days from the entry of this order;

(B) That defendant Jones shall appoint Captain Eddie Norred and Lieutenant Wanda Robinson as co-administrator trainees under the interim administrator;

(C) That the search for candidates for the new permanent jail administrator position shall be re-opened and that the position shall be advertised at a substantially higher salary range;

(D) That John Veres and the Center for Business and Economic Development at Auburn University in Montgomery shall begin a strategic job analysis to determine the qualities needed of a good jail administrator;

(E) That all current candidates shall be allowed to compete for the new permanent jail administrator position;

(F) That the selection of a new permanent jail administrator shall be conducted in compliance with all applicable non-discrimination laws;

---

**136.** *Id.* at 96.

**137.** Because the best that the Sheriff's Department has to offer, Norred and Robinson, do not meet even minimum standards, it can be inferred that this is true for almost everyone in the department. In addition, it could be argued that, because these conditions appear to be the direct result of racial and sexual discrimination, they are redressable under Federal Civil Rights Laws. This issue is, however, not before the court. Nevertheless, the court hopes that the defendants will take it upon themselves to address this matter with dispatch.

(G) That a new permanent jail administrator shall be selected within 15 months of the date of this order;  and

(H) That, if a new permanent jail administrator has not been selected within 15 months, the defendants must petition the court for an extension and explain to the court why an administrator has not yet been selected.

The clerk of the court is DIRECTED to issue a writ of injunction.